**No. 26-40106**

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

EXXON MOBIL CORPORATION,

*Plaintiff-Appellee*,

v.

ROBERT ANDRES BONTA, in his Individual Capacity, also known as Rob Bonta,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Eastern District of Texas, No. 1:25-cv-11

# BRIEF FOR PLAINTIFF-APPELLEE EXXON MOBIL CORPORATION

KELLY BRECHTEL BECKER
MICHAEL P. CASH
KATHRYN ZAINEY GONSKI
LISKOW & LEWIS, A.P.L.C.
Suite 5000
701 Poydras Street
New Orleans, LA 70139

PAUL D. CLEMENT
ERIN E. MURPHY
CHADWICK J. HARPER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiff-Appellee*

September 3, 2026

## CERTIFICATE OF INTERESTED PERSONS

(1) Case No. 26-40106: *Exxon Mobil Corporation v. Robert Andres Bonta*

(2) The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Exxon Mobil Corporation is the Appellee in this case. Exxon Mobil Corporation is the wholly owned subsidiary of ExxonMobil Holdings Corporation (XOM). Attorneys for Exxon Mobil Corporation include Kelly Becker, Kathryn Gonski, Michael Cash, and Wade Thomas Howard of Liskow & Lewis, as well as Paul Clement, Erin Murphy, and Chadwick Harper of Clement & Murphy, PLLC.
- Robert Andres Bonta is the Appellant in this case. Mr. Bonta is represented by R. Matthew Wise and Robert Setrakian of the California Attorney General's Office.
- The following Texas localities are intervenor-plaintiffs in the district court: City of Baytown, Texas; City of Beaumont, Texas; City of Mont Belvieu, Texas; and Chambers County, Texas. They were represented by Travis Charles Barton, James McLean Bell, III, and Jonathan D. Baughman of McGinnis Lochridge, LLP.

- Sierra Club, Inc. (defendant in the district court) was represented by Scott E. Gant and Sarah Jones of Boies Schiller Flexner, LLP, and Peter D. Kennedy of Graves Dougherty Hearon & Moody, PC.
- Surfrider Foundation, Inc. (defendant in the district court) was represented by Peter D. Kennedy, James Alan Hemphill, and Marianne W. Nitsch of Graves Dougherty Hearon & Moody, PC, and Daniela Del Rosario Wertheimer and Heather E. Murray of the Cornell First Amendment Clinic.
- Heal the Bay, Inc. (defendant in the district court) was represented by Deborah Greenleaf, Monica Celeste Vaughn, and Fallin Schwartz, all of Tribble Ross, Tommy Lee Yeates of Moore Landrey, LLP, and Peter D. Kennedy of Graves Dougherty Hearon & Moody, PC.
- Baykeeper, Inc. (defendant in the district court) was represented by John Holman Barr and Michael Forest Nelson of Burt Barr & Associates LLP, Bryan Adam Terrell of Weller Green Toups & Terrell LLP, and Peter D. Kennedy of Graves Dougherty Hearon & Moody, PC.
- Intergenerational Environmental Justice Fund Ltd. (defendant in the district court) was represented by John Charles Quinn, Joshua Adam

Matz, and Matthew J. Craig of Hecker Fink, LLP, and Joaquin Gonzalez of Marziani, Stevens & Gonzalez PLLC.

s/Paul D. Clement
Paul D. Clement
*Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiff-Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee Exxon Mobil Corporation agrees that oral argument would be helpful in deciding this case.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iv

TABLE OF AUTHORITIES ........................................................................... vii

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................... 4

STATEMENT OF THE ISSUES ....................................................................... 4

STATEMENT OF THE CASE .......................................................................... 5

A. Background ........................................................................................ 5

B. Procedural History .............................................................................. 11

SUMMARY OF ARGUMENT ......................................................................... 13

STANDARD OF REVIEW ............................................................................... 17

ARGUMENT .................................................................................................. 18

I. The District Court Correctly Denied Bonta Official Immunity For His Defamatory Statements ........................................................................ 18

A. Both Texas and California Immunity Law Protect Only Statements Made Within the Scope of an Official's Employment ........................................................................ 18

B. Bonta's Campaign Email Was Private Action Taken in His Capacity as a Political Candidate, Not Official Action Taken in His Capacity as California's Attorney General ............................. 20

C. Bonta's Arguments Cannot Convert A Campaign Email Into Official Action ....................................................................... 27

D. Bonta's Defamatory Statements to Reuters Do Not Enjoy Official Immunity, Either ................................................................ 36

II. The Eleventh Amendment Does Not Bar This Suit ..................................... 43

A. The Eleventh Amendment Generally Does Not Protect Officers Sued in Their Individual Capacities ..................................... 43

B. Sovereign Immunity Does Not Apply to This Suit Against Bonta in His Individual Capacity ...................................................... 46

C. Bonta's Contrary Arguments Are Legally and Factually Flawed ........................................................................................ 47

CONCLUSION ........................................................................................ 54

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Alden v. Maine*,
527 U.S. 706 (1999)....................................................................................50

*Bailey v. Shell W. E&P, Inc.*,
609 F.3d 710 (5th Cir. 2010)........................................................................18

*Barr v. Matteo*,
360 U.S. 564 (1959)....................................................................................32

*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) ....................................................................*passim*

*Campbell v. Reisch*,
986 F.3d 822 (8th Cir. 2021)................................................................ 15, 21

*Carter v. Diamond URS Huntsville, LLC*,
175 F.Supp.3d 711 (S.D. Tex. 2016)............................................................30

*City of Austin v. Paxton*,
943 F.3d 993 (5th Cir. 2019 ..........................................................................44

*City of Houston v. Rodriguez*,
704 S.W.3d 462 (Tex. 2024) ..........................................................................19

*City of Houston v. Sauls*,
690 S.W.3d 60 (Tex. 2024) ..................................................................... 19, 41

*Colome v. State Athletic Com.*,
55 Cal.Rptr.2d 300 (Cal. Ct. App. 1996) ......................................................35

*Demery v. Kupperman*,
735 F.2d 1139 (9th Cir. 1984)........................................................................50

*Escalante v. Lidge*,
34 F.4th 486 (5th Cir. 2022)..........................................................................30

*Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*,
246 S.W.3d 42 (Tex. 2008) ..................................................................... 39, 41

*Felts v. Reed*,
2022 WL 898768 (E.D. Mo. Mar. 28, 2022) ....................................................21

*Fitzgerald v. City of Fresno*,
2022 WL 1204707 (E.D. Cal. Apr. 22, 2022)....................................................19

*Ford Motor Co. v. Parks*,
691 S.W.3d 475 (Tex. 2024)..........................................................................39

*Garza v. Harrison*,
574 S.W.3d 389 (Tex. 2019) ..................................................................... 19, 39

*Gilbert v. Donahoe*,
751 F.3d 303 (5th Cir. 2014)..........................................................................42

*Gundy v. City of Jacksonville*,
50 F.4th 60 (11th Cir. 2022)............................................................................25

*Haverkamp v. Linthicum*,
6 F.4th 662 (5th Cir. 2021)...............................................................................4

*Heidi Grp., Inc. v. Tex. Health & Hum. Servs. Comm'n*,
138 F.4th 920 (5th Cir. 2025)...........................................................................4

*Henley v. Simpson*,
527 F.App'x 303 (5th Cir. 2013)........................................................ 45, 47, 48

*Hess v. Port Auth. Trans-Hudson Corp.*,
513 U.S. 30 (1994)..........................................................................................44

*Hudson v. City of New Orleans*,
174 F.3d 677 (5th Cir. 1999)..........................................................................50

*Jackson v. Jones*,
179 F.4th 846 (11th Cir. 2026).......................................................................21

*Kilgore v. Younger*,
640 P.2d 793 (Cal. 1982) ........................................................................ 31, 37

*Krupa v. Quinn*,
596 F.Supp.3d 1127 (N.D. Ill. 2022) ....................................................... 15, 21

*Lane v. Halliburton*,
529 F.3d 548 (5th Cir. 2008)........................................................ 17, 29, 38

*Lewis v. Clarke*,
581 U.S. 155 (2017).......................................................................... 17, 49, 50, 51

*LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*,
659 F.3d 450 (5th Cir. 2011).......................................................................18

*Luder v. Endicott*,
253 F.3d 1020 (7th Cir. 2001)..................................................... 47, 48, 50

*Maranatha Corr., LLC v. Dep't of Corr. & Rehab.*,
70 Cal.Rptr.3d 614 (Cal. Ct. App. 2008) ..................................................19

*Mehau v. Reed*,
869 P.2d 1320 (Haw. 1994)...........................................................................15

*Modica v. Taylor*,
465 F.3d 174 (5th Cir. 2006)........................................................ 16, 44, 46

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)........................................................................................45

*Phillips Petrol. Co. v. Shutts*,
472 U.S. 797 (1985)......................................................................................19

*Playboy Enters., Inc. v. Sanchez-Campuzano*,
519 F.App'x 219 (5th Cir. 2013)............................................................ 19, 39

*Progressive Democrats for Soc. Just. v. Bonta*,
73 F.4th 1118 (9th Cir. 2023) .....................................................................23

*Regents of the Univ. of Cal. v. Doe*,
519 U.S. 425 (1997)......................................................................................44

*Robledo v. United States*,
147 F.4th 515 (5th Cir. 2025)...................................................... 17, 42, 53

*Rothman v. Jackson*,
57 Cal.Rptr.2d 284 (Cal. Ct. App. 1996) ..................................................32

*SEC v. Hallam*,
42 F.4th 316 (5th Cir. 2022) .......... 40

*Stanson v. Mott*,
551 P.2d 1 (Cal. 1976) .......... 23

*Stramaski v. Lawley*,
44 F.4th 318 (5th Cir. 2022) .......... 17, 44, 46, 48

*Stratta v. Roe*,
961 F.3d 340 (5th Cir. 2020) .......... 44

*Tamez v. City of San Marcos*,
118 F.3d 1085 (5th Cir. 1997) .......... 17

*Tex. Adjutant Gen.'s Off. v. Ngakoue*,
408 S.W.3d 350 (Tex. 2013) .......... 35

*Texas v. Yellen*,
105 F.4th 755 (5th Cir. 2024) .......... 30, 36

*Tutor-Saliba Corp. v. Herrera*,
39 Cal.Rptr.3d 21 (Cal. Ct. App. 2006) .......... 31, 32

*Union Pac. R. Co. v. La. Pub. Serv. Comm'n*,
662 F.3d 336 (5th Cir. 2011) .......... 44

*Vargas v. City of Salinas*,
205 P.3d 207 (Cal. 2009) .......... 23, 28

*Wilkerson v. Univ. of N. Texas ex rel. Bd. of Regents*,
878 F.3d 147 (5th Cir. 2017) .......... 19

*Williams v. Brooks*,
945 F.2d 1322 (5th Cir. 1991) .......... 33

*Williams v. Gorton*,
529 F.2d 668 (9th Cir. 1976) .......... 51

*Wilson v. Beebe*,
770 F.2d 578 (6th Cir. 1985) .......... 50

*Wurzelbacher v. Jones-Kelley*,
675 F.3d 580 (6th Cir. 2012) .....25

**Statutes**

Cal. Civ. Code §47(a) ..... 19, 40

Cal. Gov't Code §825(a) .....51

Cal. Gov't Code §8314 ..... 23, 28, 34, 49

Cal. Gov't Code §19815(d) .....24

Cal. Gov't Code §19990 .....40

Cal. Gov't Code §19990(a)-(b) .....23

Tex. Civ. Prac. & Rem. Code Ann. §101.106(a)-(f) .....39

**Other Authorities**

Att'y Gen. of Tex., *Attorney General Ken Paxton Files Landmark Lawsuit Against Discord for Deceiving Parents and Exposing Texas Children to Predators* (May 22, 2026), https://perma.cc/2NJB-6QSZ .....34

Rob Bonta for Att'y Gen., *Re-Elect Rob Bonta California Attorney General* (2026), https://perma.cc/7KQ9-YH3A .....52

Environmental Protection Agency, Advanced Recycling of Plastics (May 22, 2026), https://perma.cc/3C7R-ZNXS .....5

Merriam Webster's Online Dictionary, *Constituent*, https://tinyurl.com/2tddtwp3 .....25

Merriam Webster's Online Dictionary, *Constituency*, https://tinyurl.com/8ebw7jm2 .....25

Off. of Att'y Gen. James Uthmeier, *Attorney General James Uthmeier Launches Investigation into Discord over Child Safety Concerns* (Mar. 18, 2026), https://perma.cc/5HBG-THB4 .....34

Press Release, Rob Bonta, Off. of the Att'y Gen., *Attorney General Bonta Joins Coalition to Defend International Students' and Faculty's Free Speech Rights* (Aug. 13, 2026), https://perma.cc/8H8S-4W3A ..... 24, 52

Ben Reynolds, *Incumbency Performance in State Elections*, Council of State Gov'ts (Nov. 16, 2022), https://perma.cc/L8W8-TPNU ...........................35

## INTRODUCTION

Doing a job is one thing; seeking the job another. And Californians did not elect Rob Bonta to serve as their state's Attorney General so he could campaign for office, let alone do so by soliciting financial support from citizens in Texas. For that basic reason, defamatory statements made as part of a political campaign are outside the scope of official immunity. Unlike actions taken by an officeholder *qua* officeholder, those electioneering activities are done by the office-seeking individual who remains accountable for his actions. So, while appellant's brief struggles mightily to portray this case as an existential threat to official immunity, in reality, the parties' dispute is much more prosaic. It is bedrock law that official immunity extends only to acts taken by an official in his official capacity. That is the law of both Texas and California—and virtually every other jurisdiction in the Nation. It is equally well-settled that campaigning for office is not part of an elected official's job. After all, doing a job and seeking the job are two different things. Appellant does not appear to dispute either of those principles. Nor does he dispute that California extends no more immunity than Texas does to the *knowingly false* statements of an official. He just disputes how those principles apply to the allegations in this complaint. But the district court correctly concluded that they foreclose his plea for dismissal. This Court should affirm.

This interlocutory appeal arises from a suit filed by Exxon Mobil Corporation ("ExxonMobil") to protect its business and reputation from defamatory statements made by Bonta and others relating to plastic recycling. In brief, ExxonMobil pioneered its advanced recycling program to respond to the problems arising from plastic waste. Advanced recycling is a technology that aggregates different, hard-to-recycle plastics and converts them into raw materials for making valuable new products. Bonta and his allies have filed lawsuits against ExxonMobil in California deriding this innovative work as mere "greenwashing" and accusing the company of having engaged in a decades-long campaign of lies and deception. *See* ROA.23-28; ROA.39. That litigation is backed by a foreign business magnate and would-be competitor of ExxonMobil's in the global energy market. That individual originally proposed his own solution to plastic waste, but once ExxonMobil turned him down (in part because his proffered "solution" would constitute a blatant antitrust violation), he opted for lawfare instead. That effort spawned two lawsuits against ExxonMobil in California—one brought by various environmental groups and one brought by Bonta on behalf of California—and a steady bombardment of statements maligning ExxonMobil as a "liar" and "perpetuator" of the "myth" of plastic recycling. *See* ROA.38-39; ROA.1845.

But Bonta was not content to make those allegations in court papers subject to adversarial testing. Instead, he launched those defamatory statements on the

campaign trail and in funding solicitations disseminated far and wide, including in the heart of Texas. ExxonMobil brought this lawsuit to seek recourse for those damaging statements. Its complaint underscores how they have impacted its investments in advanced recycling, including its work in Texas, where its advanced recycling facilities are located. ExxonMobil also highlighted that they involved statements made by Bonta in the course of personal and political activities, not his official duties. Most notably, in an electioneering email to potential supporters throughout the country, Bonta charged that "ExxonMobil … spent years convincing the public that recycling makes plastic, including single-use plastic, sustainable. *It doesn't.* The truth is that only 5 percent of U.S. plastic waste is recycled. … *Exxon Mobil knew, and Exxon Mobil lied.*" *See* ROA.72-75 (emphasis in original).

The district court rejected Bonta's claims of official and sovereign immunity as to his campaign email and additional statements Bonta made in an interview with Reuters. *See* ROA.1873-82. That decision was correct. Texas and California law alike protect state officials for their conduct carried out in the scope of their employment. But campaigning is well outside Bonta's scope of employment, so official immunity does not shield his defamatory campaign email. The same goes for Bonta's defamatory statements in the Reuters interview. Nor should sovereign immunity should stop this suit. California is not the real party in interest here; Bonta is. Though Bonta occupies the office of Attorney General of California, his

unofficial actions remain his own. And he remains responsible for those statements and cannot hide behind California's sovereign immunity. Bonta is neither his office nor California, and nowhere is that more obvious than on the campaign trail. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over this suit pursuant to 28 U.S.C. §§1332 and 1367. After the district court denied Bonta's motion to dismiss on February 13, 2026, Bonta timely filed a notice of appeal on February 18, 2026. ROA.1842-87 (Opinion and Order); ROA.1888-90 (Notice of Appeal). This Court has jurisdiction under 28 U.S.C. §1291 pursuant to the collateral-order doctrine, which this Court has held permits appeals of the denial of state-law immunities, *see Heidi Grp., Inc. v. Tex. Health & Hum. Servs. Comm'n*, 138 F.4th 920, 928 (5th Cir. 2025), as well as denials "of Eleventh Amendment sovereign immunity," *Haverkamp v. Linthicum*, 6 F.4th 662, 669 (5th Cir. 2021) (per curiam).

## STATEMENT OF THE ISSUES

1. Did the district court err in denying official immunity to Bonta for statements made in a campaign email to his political supporters and in an interview where Bonta is alleged to have made false statements as part of his campaign efforts?

2. Did the district court err in denying Eleventh Amendment sovereign immunity where the suit seeks relief only against Bonta in his individual capacity for his unofficial actions?

## STATEMENT OF THE CASE

### A. Background[1]

1. Plastic waste poses sustainability challenges, and some plastic products are especially difficult to handle with conventional recycling methods. *See, e.g.*, ROA.43-44. To meet those challenges, ExxonMobil has invested significant resources in a process known as advanced recycling. ROA.24-25; ROA.36.

As the name suggests, advanced recycling (sometimes called "chemical recycling") supplements traditional recycling. The process begins with taking plastic materials and sorting, shredding, and processing them to make the material suitable for advanced recycling. ROA.43-44. Next, at an advanced recycling facility, those materials are subjected to "pyrolysis," which entails heating the materials in an oxygen-starved environment to break them down into liquid and gas molecules. ROA.43-44.[2] That, in turn, creates raw materials that are identical to those derived from traditional fossil-based sources. ROA.43-44.

[1] The following background comes primarily from ExxonMobil's complaint, ROA.23-62, and the district court's opinion, ROA.1842-87.

[2] While there are other forms of advanced recycling, they are not salient to this appeal. *See generally* Environmental Protection Agency, Advanced Recycling of Plastics (May 22, 2026), https://perma.cc/3C7R-ZNXS.

Those raw materials can, in turn, become valuable new products, like fuels, lubricants, high-performance chemicals, and plastics. ROA.43-44. So deployed, advanced recycling can lead to a more sustainable economy. Not only that, but advanced recycling enables some otherwise difficult-to-recycle materials (*e.g.*, artificial turf and multi-layer film packaging like chip bags) to be reprocessed instead of simply sitting in landfills. ROA.44. Recognizing its potential benefits, about half the states in the Union have passed laws supporting advanced recycling efforts. ROA.27.

2. ExxonMobil began its advanced recycling work in Texas. ROA.28; ROA.31. That is unsurprising given the company's deep roots in the state, where it is based. ROA.28. Naturally enough, when ExxonMobil began to explore opportunities in advanced recycling, it started at home. In 2021, for example, ExxonMobil invested millions of dollars in advanced recycling at a facility in Baytown, Texas, to demonstrate that the technology works at scale. ROA.36. Encouraged by what it saw, ExxonMobil announced in 2024 that it would invest $200 million more to double the advanced-recycling capacity of its Baytown facility. ROA.36. At the same time, the company announced plans to add advanced recycling to a facility in Beaumont, Texas, and it has invested millions more to achieve that end. *See* ROA.36; ROA.33.

By the time this suit began, those efforts had allowed ExxonMobil to recycle more than 70 million pounds of plastic waste. ROA.26-27. ExxonMobil also announced its ambitions to do much more: The company aims to have over 500 million pounds of advanced-recycling capacity in Texas alone by the end of this year, *see* ROA.44-45, and, by 2027, ExxonMobil hopes to have one billion pounds of advanced-recycling capacity in place globally, ROA.36.

3. Not everyone is a fan of Exxon's advanced-recycling initiatives. Andrew Forrest, an Australian billionaire and the founder of an Australian mining conglomerate called Fortescue, had a different vision for how to handle the problems plastic waste posed. In 2019, Forrest launched a campaign through another organization he founded—the Minderoo Foundation Ltd. ("Minderoo")—called "Sea the Future," which proposed to try to end plastic waste through what Forrest termed a "levy" on virgin plastic resin (*i.e.*, plastic resin made from fossil fuels, not recycled plastic products). ROA.33-34. Forrest's plan was to convince plastic resin makers to jointly agree to artificially inflate the price of virgin plastic resin through a self-imposed "levy." The funds raised from that levy would be managed by Minderoo and used to address plastic pollution. ROA.33-34. By raising the price of virgin plastic products, Forrest claimed, this scheme would encourage people to purchase more recycled plastic and also encourage advanced recycling, which he initially supported. ROA.34-35.

In 2019, Forrest visited ExxonMobil's campus in Texas to try to sell the company on his idea. But ExxonMobil's representatives explained that an agreement by industry competitors to inflate the price of their goods, even if done with the best of intentions, would be a price-fixing scheme in contravention of U.S. antitrust laws. ROA.33-34. Undeterred, Forrest continued to pitch his "levy" idea—and to tout it as a way to shift from "mechanical recycling" (*i.e.*, traditional recycling) to "chemical … recycling" (*i.e.*, advanced recycling). ROA.34-35. But the industry did not adopt Forrest's approach.

At that point, Forrest and Minderoo took a very different tack. Apparently unhappy that ExxonMobil did not support Forrest's initiative, they became harsh critics of the company and the advanced recycling methods they previously touted. ROA.35-36. And they did not stop with simply criticizing ExxonMobil's efforts; they began disseminating false and deceptive statements about ExxonMobil, plastics waste, and advanced recycling. ROA.35-36. Meanwhile, Minderoo founded a subsidiary called the Intergenerational Environment Justice Fund Ltd. ("IEJF"), which gets the bulk of its funding from Fortescue and shares executives with both Minderoo and Fortescue. ROA.26-39. IEJF, in turn, hired a U.S. law firm to bring claims against ExxonMobil in California. *See* ROA.36-39; ROA.1847. The firm proceeded to file a lawsuit on behalf of several environmental groups in late September 2024—and Attorney General Bonta filed a lawsuit on behalf of the State

of California the same day, which he announced in a joint press conference with the environmental-group plaintiffs. ROA.39.

The Attorney General of California has, of course, both the power and the duty to represent the state in litigation. But Bonta did not confine his attacks on ExxonMobil to the courtroom. He instead began leveling a series of defamatory attacks on the company not only outside the courtroom, but outside the scope of his official duties as Attorney General. *See, e.g.*, ROA.46-48; ROA.27; ROA.1864-1866. Two are of particular relevance here.

The first came during an interview with Reuters during "Climate Week NYC." ROA.47. Climate Week NYC was a "global climate event" that took place in New York City and featured "leaders from the world of business, tech, politics, academia, and civil society." ROA.1381. In an interview with Reuters while there, Bonta discussed politics at some length, and in particular, the "very tight" 2024 presidential election. ROA.66. For instance, he emphasized his view that as a candidate, then-Vice President Kamala Harris was "electrifying and unifying *our party*." ROA.66 (emphasis added). And, in that context, Bonta took aim at ExxonMobil's advanced-recycling initiatives, claiming: "[L]ook at Houston … [t]hese are Advanced Recycling projects that are supposed to be the new solution, and what is happening is post-consumer plastic waste is just piling up. It is not being recycled." ROA.50; *see* ROA.1867. Bonta went on to malign ExxonMobil's integrity and honesty,

declaring: "Like a false promise about this new, so called newfangled, advanced recycling: it's not based on truth." ROA.65. Putting an even finer point on it, Bonta branded ExxonMobil "one of the biggest liars." ROA.66. Later, Bonta leveraged his personal social-media accounts to spread those attacks further still, reposting them for his followers on his individual Instagram and X accounts. *See* ROA.47.

Second, in an email sent to recipients throughout the country—including in Texas—seeking support and donations for his reelection campaign, Bonta took aim at ExxonMobil yet again. He called the company "one of the world's largest polluters," and accused it of "decades of lies and deception that created and exacerbated the global plastics crisis." ROA.73-74. "ExxonMobil," the email continued,

> spent years convincing the public that recycling makes plastic, including single-use plastic, sustainable. *It doesn't.* **The truth is that only 5 percent of U.S. plastic waste is recycled. The rest ends up in our environment, our waterways and oceans, our wildlife, and even our own bodies.** *Exxon Mobil knew, and Exxon Mobil lied.*

ROA.73-74 (emphases in original). The email, which was expressly designated "PAID FOR BY ROB BONTA FOR CALIFORNIA ATTORNEY GENERAL," encouraged supporters to "Let Rob know you have his back," and provided a link to donate online, as well as instructions on how to contribute "by check" to "Rob Bonta for Attorney General 2026." ROA.74.

### B. Procedural History

Finding itself labeled a liar and its advanced-recycling efforts derided as fraudulent, ExxonMobil filed this suit to defend its business and reputation. ExxonMobil brought claims against Bonta and the environmental-group plaintiffs who had disparaged the company as a liar and decried its advanced-recycling initiatives. *See* ROA.23-62 (Complaint); ROA.63-166 (Exhibits). The complaint alleges that Bonta made defamatory statements not in his capacity as Attorney General, but in his "personal capacity" to "support his election campaign." ROA.48; *see* ROA.46-51. The complaint details how some customers have hesitated to work with ExxonMobil or backed out of proposed advanced-recycling transactions entirely, pointing to Bonta's statements as a reason for concern. ROA.55-56. Accordingly, ExxonMobil brought claims under Texas law, including counts sounding in business disparagement, defamation, and tortious interference with contracts, and sought both damages and equitable relief. ROA.56-61.

Bonta moved to dismiss, arguing (as relevant here) that the court lacked personal jurisdiction over him and that ExxonMobil's claims are barred by both official and sovereign immunity. ROA.269-98. ExxonMobil opposed the motion, contending that (i) the court had jurisdiction over Bonta because (among other things) his defamatory statements targeted Texas; and (ii) those statements were made in Bonta's personal capacity as a candidate, not his official capacity as

California's Attorney General. ROA.1357-90. The district court denied Bonta's motion in full. *See* ROA.1842-87.[3]

The court first concluded (in a holding that Bonta does not challenge in this appeal, *see* Bonta.Br.2 n.1) that it has personal jurisdiction over Bonta because two sets of his challenged statements—statements in the Reuters interview and in his campaign email—were directed at Texas. ROA.1868-69. "If Bonta wants to fundraise in Texas," the court reasoned, "he can answer to courts in Texas." ROA.1868.

The court next rejected Bonta's official-immunity claim. The court first determined that, under both California law and Texas law, the key question is whether Bonta made the challenged statements pursuant to his "official duties." ROA.1877. Since the court found no conflict between the two states' laws, it applied Texas law, as Texas choice-of-law rules require. ROA.1877. And since Texas's immunity statute covers only Texas officeholders, the court applied Texas common law, which it concluded provides the same substantive protection. ROA.1877.

The court then rejected Bonta's official-immunity argument as to the statements over which it found personal jurisdiction. First, the court concluded that,

[3] The court also granted the environmental groups' motions to dismiss for lack of personal jurisdiction. *See* ROA.1844; ROA.1849. That holding is not at issue on this appeal.

though Bonta's statements during his interview with Reuters at Climate Week NYC were made in his official capacity, Texas law provides no immunity for official statements made in bad faith, and the complaint adequately alleges a factual dispute about whether Bonta's interview statements were made in "good faith." ROA.1879-80. Second, the court concluded that the "election email" was not an official action. The "campaign contribution link" it included confirmed "the email's true nature: a campaign promotion." ROA.1880. And "[c]ampaigning is not within Bonta's scope of employment" as California's Attorney General. ROA.1880.

The district court also rejected Bonta's attempt to invoke sovereign immunity. As the court explained, "the general rule is that a public official does not get Eleventh Amendment immunity from an action against him in his individual capacity." ROA.1881 (quotation marks omitted). Because this suit "concerns an *individual's* behavior," not any state policy or rule, the court concluded, "California is not the target of this lawsuit and the Eleventh Amendment does not apply." ROA.1881-82.

## SUMMARY OF ARGUMENT

The district court correctly denied Bonta's claims of official immunity and sovereign immunity as to the statements still at issue. Campaigning forms no part of Bonta's job as Attorney General of California, and he cannot claim official immunity for unofficial acts. And this suit is, in form and substance, against Bonta

as an individual, not against California. So neither official immunity nor sovereign immunity bars this suit.

While Bonta's brief argues at length about choice-of-law principles, all agree on the only thing that matters here: Both Texas and California extend official immunity only to the official conduct of an officeholder. Yet ExxonMobil's complaint plausibly alleges that the statements here were made in Bonta's capacity as a candidate, not his capacity as Attorney General. Indeed, one set comes from an email to potential "grassroots supporters" all throughout the country—including in Texas—imploring them to give money to Bonta's campaign for reelection, and the other set came during a politically charged interview given at "Climate Week NYC." Campaigning for reelection is decidedly not one of the job duties of the Attorney General of California. To the contrary, California *prohibits* state officials from using their office to engage in campaign activities. And a suit against an elected official for unofficial acts is not a suit against the State of California, so Bonta cannot take solace in sovereign immunity either. This Court accordingly should affirm across the board.

Starting with official immunity, when an individual speaks as a candidate, those statements are plainly distinct from statements made as part of an elected official's day job. Elected officials may of course campaign for office—whether to retain their own or obtain another—but such electioneering is not discharging their

duty as elected officials. That basic distinction, grounded in the principle that the office itself is agnostic about who holds it, runs throughout the law. Simply put, "[t]he job of an elected official is not to campaign to remain an elected official." *Krupa v. Quinn*, 596 F.Supp.3d 1127, 1138 (N.D. Ill. 2022); *see also Campbell v. Reisch*, 986 F.3d 822, 825 (8th Cir. 2021) ("Running for public office is not state action; it is a private activity."); *Mehau v. Reed*, 869 P.2d 1320, 1332-33 (Haw. 1994) (holding a city employee was not acting within the scope of his employment when he "delivered [a] speech as a political candidate" since his "candidacy was not part of his job"). When campaigning, a sitting officer is "acting as office-*seeker*, not office-*holder*—no less than are the persons running against him when they take precisely the same actions in their competing campaigns to attain precisely the same office." *Blassingame v. Trump*, 87 F.4th 1, 4 (D.C. Cir. 2023). Any other view would distort elections by conferring an extraordinary advantage on incumbents, and violate the basic notion that no candidate for public office has a license to lie and defame.

This is thus an exceptionally straightforward case as to Bonta's email statements, as it cannot seriously be disputed that the email was a campaign communication. The email itself makes that clear—not only by expressly soliciting "donations," but by disclosing that it was paid for by Bonta's registered reelection campaign committee. Bonta cannot credibly argue that the email was sent as part of

his official duties, as it would be illegal under California law for Bonta to use the official trappings of his office to act on behalf of his reelection campaign. And while the Reuters interview at Climate Week NYC is admittedly a closer question, the complaint alleges enough to raise a factual dispute about the capacity in which Bonta was acting at this motion-to-dismiss stage. The interview took place at a "global climate event" on the opposite side of the country from California, ROA.1381, and featured heavy political overtones, ROA.66, rendering it a far cry from something like an official press conference held by the Attorney General's Office to inform Californians of state business. Moreover, the complaint alleges that Bonta knew that he was leveling false allegations at ExxonMobil, which would take even official conduct outside the scope of immunity under Texas law (and Bonta has not argued that California law shields such false statements in a way Texas law does not).

Because this lawsuit asserts claims against Bonta for actions taken in his individual capacity, the district court correctly concluded that the Eleventh Amendment poses no barrier either. "As a general rule the Eleventh Amendment does not bar suits against officers in their individual capacities." *Modica v. Taylor*, 465 F.3d 174, 183 (5th Cir. 2006). That general rule applies here, as this suit seeks relief *against* Bonta in his individual capacity for actions taken *by* Bonta in his individual capacity. ExxonMobil does not seek any money that it claims is owed by the state or seek to alter any state policies or practices. It simply seeks to hold Bonta

accountable for actions taken outside his role as Attorney General. Bonta suggests that the suit still implicates the state's fisc because California will indemnify him. But it is well-settled that a state cannot bestow sovereign immunity for the private acts of its public officers by agreeing to indemnify them for bad behavior undertaken in their personal capacity. *See, e.g.*, *Lewis v. Clarke*, 581 U.S. 155, 166-67 (2017). At any rate, it is far from clear that California either does or ever would indemnify its officers for defaming third parties in the course of campaigning for reelection. In short, in both form and substance, this is a suit against Rob Bonta, not California. This Court should affirm.

## STANDARD OF REVIEW

State-law official immunity and Eleventh Amendment sovereign immunity determinations are subject to de novo review. *See Tamez v. City of San Marcos*, 118 F.3d 1085, 1091 (5th Cir. 1997) (official immunity under Texas law); *Stramaski v. Lawley*, 44 F.4th 318, 321 (5th Cir. 2022) (Eleventh Amendment sovereign immunity). This Court "take[s] the well-pled factual allegations of the complaint as true and view[s] them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). A motion to dismiss under Rule 12(b)(1) may be granted only when "it appears certain that the plaintiff cannot prove any set of facts in support of [the plaintiff's] claim that would entitle plaintiff to relief." *Robledo v. United States*, 147 F.4th 515, 519 (5th Cir. 2025).

## ARGUMENT

### I. The District Court Correctly Denied Bonta Official Immunity For His Defamatory Statements.

The district court denied Bonta's efforts to invoke official immunity with respect to his campaign email and two defamatory statements he made in an interview with Reuters. That holding was eminently correct. Neither Texas nor California law immunize statements made outside the scope of a public official's duties, and Bonta, as California's Attorney General, has no duty to campaign or fundraise. To the contrary, it is doubtful that Bonta *could* legally use his office to engage in overt campaign activity. The complaint also plausibly alleges that the statements to Reuters likewise were not made in Bonta's official capacity, and in all events were not made in the good faith that Texas law requires (and that Bonta has never argued California law does not).

#### A. Both Texas and California Immunity Law Protect Only Statements Made Within the Scope of an Official's Employment.

In this diversity case, this Court "appl[ies] the forum state's conflicts-of-law rules to determine what law governs state-law claims." *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010); *LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 456 (5th Cir. 2011). "Under the conflict rules of Texas," this Court "need not decide whether [California] or Texas law governs if our conclusions would be the same under either state's law." *LHC Nashua P'ship*, 659 F.3d at 456; *see Playboy Enters., Inc. v. Sanchez-Campuzano*, 519 F.App'x 219, 225

(5th Cir. 2013) (per curiam) (same); *cf. Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 839 n.20 (1985) (similar). That is the situation here, as it is undisputed that both Texas and California law extend official immunity only to statements of state employees made within the scope of their employment.

That is true as to both statutory and common-law immunity in Texas. *See City of Houston v. Sauls*, 690 S.W.3d 60, 70 (Tex. 2024) ("[O]fficial immunity protects governmental employees only when they are performing (1) discretionary duties, (2) in good faith, and (3) within the scope of their authority."); *City of Houston v. Rodriguez*, 704 S.W.3d 462, 469 (Tex. 2024) (same); *Garza v. Harrison*, 574 S.W.3d 389, 399 (Tex. 2019) (explaining that the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code Ann. §101.106, offers a remedy for "a public employee's conduct *within the scope of employment*") (emphasis added); ROA.1874-76.[4] And it is equally true of California law. *See* Cal. Civ. Code §47(a) (providing official immunity only for statements made "in the proper discharge of an official duty"); *Maranatha Corr., LLC v. Dep't of Corr. & Rehab.*, 70 Cal.Rptr.3d 614, 622-23 (Cal. Ct. App. 2008); *Fitzgerald v. City of Fresno*, 2022 WL 1204707, at *6 (E.D. Cal. Apr. 22, 2022) (explaining that California law "protects any statement by a public official, so long

---

[4] Although the Texas common-law doctrine of official immunity speaks in terms of an employee's "scope of … authority" and the Texas statute speaks of his "scope of employment," the concepts are "nearly identical." *Wilkerson v. Univ. of N. Texas ex rel. Bd. of Regents*, 878 F.3d 147, 160 n.14 (5th Cir. 2017).

as it is made (a) while exercising policy-making functions, and (b) *within the scope of his or her official duties*") (emphasis added).

While Bonta takes issue with various aspects of the district court's choice-of-law analysis, *see* Bonta.Br.21-32, he nowhere disputes that Texas and California law protect only statements that are made within the scope of an official's employment. The key question, then, is whether the statements at issue (*i.e.*, the campaign email and the Reuters interview) were made in the course of Bonta's official duties as Attorney General. They were not. At the very least, the complaint adequately alleges that those statements came outside the scope of Bonta's employment. Thus, Bonta's lengthy discourse on choice-of-law principles is largely beside the point.

### B. Bonta's Campaign Email Was Private Action Taken in His Capacity as a Political Candidate, Not Official Action Taken in His Capacity as California's Attorney General.

Bonta's campaign email accusing ExxonMobil of knowingly lying to the public, *see* ROA.74 ("*Exxon Mobil knew, and Exxon Mobil lied.*"), was quintessential unofficial action. Text, context, and common sense confirm that conclusion, as do basic principles of immunity law. Simply put, an email from a candidate for California Attorney General seeking contributions from potential supporters in Texas is not the official business of the Office of the Attorney General in Sacramento. That would be beyond obvious if the electioneering solicitation

came from the incumbent's challenger. The result is no different just because the candidate happens to be the sitting Attorney General.

1. Courts widely agree, and Bonta never disputes, that campaigning is not official conduct. Public offices, as institutions, are agnostic as to who holds them next. *See, e.g.*, *Blassingame*, 87 F.4th at 4 ("The Office of the Presidency as an institution is agnostic about who will occupy it next."); *Jackson v. Jones*, 179 F.4th 846, 870 (11th Cir. 2026) (Pryor, C.J., dissenting) ("The office of lieutenant governor 'as an institution is agnostic about who will occupy' the gubernatorial office next.") (quoting *Blassingame*, 87 F.4th at 4); *cf. Krupa*, 596 F.Supp.3d at 1138 ("[I]t is not a government duty to *run* for office" because "[t]he state *qua* state is indifferent to who sits in the seats"). Courts thus have repeatedly rejected the notion that campaign activities are official ones. *See, e.g.*, *Blassingame*, 87 F.4th at 4 ("[C]ampaigning to *gain* that office is not an official act *of* the office."); *Campbell*, 986 F.3d at 825 ("Running for public office is … a private activity."); *cf. Felts v. Reed*, 2022 WL 898768, at *5 (E.D. Mo. Mar. 28, 2022) ("[A]cts that public officials take in the ambit of their personal pursuits, such as running for elected office, are not actions taken under color of law.").

Whether the actions of an official who is running for office are taken in a "private capacity as office-seeker, not an official capacity as office-holder," requires an objective inquiry into "context." *Blassingame*, 87 F.4th at 5, 21. The D.C.

Circuit's decision in *Blassingame* is instructive. That case involved whether remarks given by the sitting President at a rally on January 6, 2021, were protected by official-act immunity. *See id.* at 3-4. In answering that question, the court observed that if an activity is "clothed in the trappings of an official function based on objective indicia, it more likely constitutes an official act for immunity purposes than if it bears the hallmarks of re-election campaign activity." *Id.* at 21. And at the motion-to-dismiss stage, the court emphasized, the allegations in the complaint must be taken as true. *See id.* at 4-5; *id.* at 30; *see also id.* at 31 (Katsas, J., concurring) (explaining that the court did not decide the immunity issue but instead held "that we cannot resolve it on a motion to dismiss").

2. While separating official and electioneering conduct can sometimes be difficult, that is not the case with Bonta's email, which announced itself as electioneering conduct. That is clear from the email's text. The email is expressly styled as an campaign communication "PAID FOR BY ROB BONTA FOR CALIFORNIA ATTORNEY GENERAL." ROA.74-75. And it includes a "Donate" tab for online contributions, as well as instructions for how to "[t]o give by check" to "Rob Bonta for Attorney General 2026." ROA.74-75. Those are classic hallmarks for campaign activity, not official activity. So too is the email's sign-off line: "Thanks for standing with us, Bonta HQ." ROA.74. Campaigns have headquarters, whereas the California Attorney General has an office to conduct

official business. No reasonable reader would take an email from "Bonta HQ" soliciting campaign funding to be the official action of the state of California, as opposed to a communication from Bonta's campaign headquarters.

Indeed, it is not even clear that Bonta *could* lawfully use his office to send an email bought and paid for by his campaign seeking contributions to aid his reelection. *See* Cal. Gov't Code §8314 ("It is unlawful for any elected state … officer … to use or permit others to use public resources for a campaign activity."); *Vargas v. City of Salinas*, 205 P.3d 207, 223 (Cal. 2009) (explaining that "the expenditure of public funds to prepare or distribute [a] communication is improper" when its "style, tenor, and timing … demonstrates that the communication constitutes traditional campaign activity") (citation and quotation marks omitted); *cf. Progressive Democrats for Soc. Just. v. Bonta*, 73 F.4th 1118, 1120 (9th Cir. 2023) (noting California law limits government employees' "political fundraising" in that "they may not solicit during work hours, and they may not use state resources, their titles, or their positions when fundraising") (citing Cal. Gov't Code §19990(a)-(b)); *Stanson v. Mott*, 551 P.2d 1, 10 (Cal. 1976) (highlighting "[t]he importance of governmental impartiality in electoral matters").[5] After all, the express recipient of funds raised by the email is plainly not the state of California.

---

[5] Below, Bonta argued that his conduct did not constitute "fundraising." *See* ROA.1641. *But see* ROA.74-75 (email with a link to "Donate"). He also argued that Cal. Gov't Code §19990 applies only to executive-branch employees who are

Given this context, it is hard to see how one could read this email as anything other than a message from Bonta as a candidate. *Cf. Blassingame*, 87 F.4th at 21 (explaining that an activity "clothed in the trappings of an official function … more likely constitutes an official act for immunity purposes than if it bears the hallmarks of re-election campaign activity"). And, again, the email removes any remaining doubt by declaring that it was "PAID FOR BY ROB BONTA FOR CALIFORNIA ATTORNEY GENERAL." ROA.74-75.

Indeed, even apart from that unambiguous text, the surrounding details of the email confirm that it is what it purports to be: a campaign email to rally supporters and solicit funds. ROA.72-75. The bold color scheme and splashy title do not bespeak official action, and typical markers of official state communications, like the seal of the office of the Attorney General, are noticeably absent. *Compare* ROA.72, *with* Press Release, Rob Bonta, Off. of the Att'y Gen., *Attorney General Bonta Joins Coalition to Defend International Students' and Faculty's Free Speech Rights* (Aug. 13, 2026), https://perma.cc/8H8S-4W3A. And the email describes itself as "a critical way" the campaign "communicate[s] with grassroots supporters like you," ROA.74—familiar phrasing for those inundated by political campaigns'

---

not elected officials. ROA.1641 (citing Cal. Gov't Code §19815(d)). Even assuming Bonta is outside the scope of §19990's limitations (though the provision also addresses "state officers"), it still makes no sense to treat an email from "Bonta HQ" as being an act of the Attorney General's office. ROA.74-75.

emails and text messages, but a far cry from the officialese of formal action taken on behalf of the state.

That Bonta sent his campaign email to "supporters" across the country reinforces its electioneering nature. As Attorney General of California, Bonta owes duties to Californians. *See* Bonta.Br.16-17. Yet his email was directed to "grassroots supporters" all throughout the country (including in Texas), ROA.74, not to his constituents in California, ROA.49. Candidates for state office have supporters, who can live anywhere. *See, e.g.*, *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 582 (6th Cir. 2012) ("Defendants were supporters of President Obama's campaign, and [one defendant] donated to the President's campaign"); *Gundy v. City of Jacksonville*, 50 F.4th 60, 64 (11th Cir. 2022) (explaining that "a supporter of Ms. Brosche's mayoral campaign" had "donated to the campaign"). Offices, by contrast, have constituents, and the Attorney General of California has no constituents in Texas. *See, e.g.*, Merriam Webster's Online Dictionary, *Constituent*, https://tinyurl.com/2tddtwp3 ("a member of a constituency"); *cf. id.*, *Constituency*, https://tinyurl.com/8ebw7jm2 ("a body of citizens entitled to elect a representative (as to a legislative or executive position)" or "the residents in an electoral district"). Rather, Rob Bonta owes duties to Californians. *See* Bonta.Br.16-17. Thus, when Bonta reaches out to "grassroots supporters" in Texas, it is plain he is doing so as a candidate and engaging in

unofficial conduct. *Cf. Blassingame*, 87 F.4th at 32 (Katsas, J., concurring) ("[T]he President acts unofficially when he speaks as a candidate.").

Bonta's own brief underscores that he appreciates the difference between supporters and constituents. When describing his duties as Attorney General, Bonta speaks of his duties to his "constituents." *See, e.g.*, Bonta.Br.29 (describing how "[e]lected AGs serve all *constituents*") (emphasis added). But when it comes to his campaign email, he noticeably speaks in terms of "supporters." *See, e.g.*, Bonta.Br.5, 9, 17, 20 n.4, 43, 50. He has no real choice: Emailing one's political supporters across the country (and asking them for money) is a long way away from carrying out one's duties to constituents in a particular polity. And when Bonta spoke as a candidate to his supporters, his speech was not official speech.

To be sure, the campaign email mentions certain actions Bonta has taken as Attorney General, including that "Attorney General Rob Bonta is suing petrochemical giant ExxonMobil." ROA.72-74. But that alone cannot transform campaign speech into official action. Incumbents who are running for office routinely showcase their track records in their campaign materials. If that were enough to convert that private activity into protected official business, then nearly every campaign speech or advertisement by an incumbent in the course of campaigning would be immune. *But see Blassingame*, 87 F.4th at 20 ("When a sitting President solicits donations at a fundraiser for his reelection campaign … he

acts in an unofficial capacity as presidential candidate rather than an official capacity as incumbent President."). That makes little sense as a matter of immunity law, and it makes even less sense as a matter of election law and common sense, as it would give incumbents a free pass to launch defamatory statements—including at their opponents—that their opponents are not privileged to make. That is not and cannot be the law.

### C. Bonta's Arguments Cannot Convert A Campaign Email Into Official Action.

1. Unable to deny that campaigning is not official conduct, Bonta makes the remarkable claim that his email imploring supporters to send donations to his campaign was "official action" falling "within the heartland" of his official duties. Bonta.Br.43, 17. That reflects a distorted and implausible view of his official duties and ignores the fundamental dichotomy between discharging official duties and electioneering to maintain an individual's grip on public office.

To be sure, the email identifies Bonta as California's Attorney General and discusses the litigation his office initiated against ExxonMobil. Bonta.Br.43-44. But it is overtly styled as a message from and expressly seeks contributions to his campaign. Bonta tries to minimize the email's fundraising components by noting that they are preceded by "a solid line across the page" that, in his view, "depicted the communication's end." Bonta.Br.44. That makes far too much of a thin gray line that simply breaks up different sections of the message:


**Add Your Name »**

Thanks for standing with us,

Bonta HQ

---

**Donate »**

This email was sent to. Email is a critical way we communicate with grassroots supporters like you. However, if you would like to change your subscription preferences, here are some options:

ROA.74.

And it conspicuously ignores what follows a thicker grey line further down—namely, a disclosure that the communication was "PAID FOR BY ROB BONTA FOR CALIFORNIA ATTORNEY GENERAL 2026." ROA.75. It would be odd indeed to think that official action of the state of California had been "paid for by Rob Bonta for California Attorney General 2026," and it would be troubling have the Office of Attorney General relabeled "Bonta HQ." ROA.74-75 (capitalization altered). And, again, Bonta has never explained how it could be legal for him to use the trappings of his office to send communications bought and paid for by his campaign for political office. *See* Cal. Gov't Code §8314; *Vargas*, 205 P.3d at 223. But one thing is abundantly clear: Declaring that communication an official act *as*

*a matter of law* at the motion-to-dismiss stage would flip Rule 12 practice on its head. *See Lane*, 529 F.3d at 557.

2. With no serious argument that a mass campaign contribution email is a communication on behalf of the Office of the Attorney General, Bonta attacks a strawman, accusing the district court of "carv[ing] an 'alleged-fundraising-motives' exception" to the general rule that "official conduct" is immune. Bonta.Br.11; *see* Bonta.Br.44-47.

But the district court did not invent any such "alleged-fundraising-motives" exception to official action. *Contra* Bonta.Br.11, 44-47. Indeed, while Bonta frequently argues about "motive" and "motivation" throughout his brief, the district court's opinion never mentions the word "motivation" (or any variant of it). The court's analysis instead focused on the context in which Bonta made the challenged statements—namely, while "[c]ampaigning." ROA.1880. There is nothing remotely subjective about a "Donate" button. And that objective fact confirms that Bonta's mailing falls on the campaigning side of the line.

In fact, the court went out of its way to make clear that it was *not* embracing a motivation-based rule, as it specifically noted that "the outcome may be different for statements made at press conferences" because "an elected official can make statements communicating his office's activities, with an unspoken expectation that later on he will receive campaign donations as a result." ROA.1880 (citing *Carter*

*v. Diamond URS Huntsville, LLC*, 175 F.Supp.3d 711, 751 (S.D. Tex. 2016)). The problem here, as the court explained, is that Bonta did not describe the activities of his office with the "unspoken" hope of securing political support; he touted his activities as Attorney General to *explicitly* solicit "campaign contributions." ROA.1880. "[T]he contribution request," the court explained, "betrays the email's true nature: a campaign promotion." ROA.1880. That is an objective fact, not a subjective motivation. And under California and Texas law alike, the objective act of "[c]ampaigning is not within Bonta's scope of employment." ROA.1880.[6]

In all events, Bonta's strawman argument does him no good, as *this* Court certainly need not consider Bonta's motivations to conclude that a communication bought and paid for by, and seeking contributions to, an elected official's campaign for political office is decidedly not an official communication of the Office of the Attorney General. *See Texas v. Yellen*, 105 F.4th 755, 763 (5th Cir. 2024) (this Court "may affirm for any reason supported by the record, even if not relied on by the district court"); *cf. Escalante v. Lidge*, 34 F.4th 486, 494 (5th Cir. 2022) ("[W]e review judgments, not opinions."). And here, the record reflects that Bonta's email

[6] For much the same reason, Bonta's attacks on the district court's "good faith" analysis, *see* Bonta.Br.32-37, do not matter for purposes of the campaign email. Because the court concluded that the email was outside the scope of Bonta's official duties, the good-faith rule was not relevant to its ruling on that communication. In fact, while the court conducted a good-faith analysis as to the other two communications, it did not conduct one as to the email. *See* ROA.1879-80.

to campaign supporters was not official action—a conclusion that is amply supported by objective facts that more than suffice to sustain the district court's rejection of Bonta's effort to have this suit dismissed at the threshold.

That readily distinguishes the cases on which Bonta relies, which merely rejected the type of motivation-based analysis that the district court declined to embrace. Take, for instance, *Kilgore v. Younger*, 640 P.2d 793 (Cal. 1982). There, the California Supreme Court concluded that one of Bonta's predecessors as Attorney General acted within the scope of his duties when, in the course of a press conference with members of a state commission that had prepared a report on organized crime, he announced his adoption of the commission's report. *See id.* at 795-96. As the court explained, the AG had "called his press conference in his capacity as Attorney General, purported to act in such role throughout its duration and … dealt exclusively with law enforcement issues." *Id.* at 798. Whether he may have had political motivations for his announcement was therefore beside the point; what mattered was that he was "discharging an 'official duty' at the press conference," which made his actions "for all intents and purposes indistinguishable from actions initiated by public officials truly oblivious to the political ramifications of their moves." *Id.*

*Tutor-Saliba Corp. v. Herrera*, 39 Cal.Rptr.3d 21 (Cal. Ct. App. 2006), is, if anything, even further afield. That case involved a claim that a city attorney

allegedly defamed the plaintiff when, while giving a speech in his capacity as city attorney in the city where he served, he responded to the mayor's claim that he supported a veto earlier that day of funding for litigation against the plaintiff. *Id.* at 26. Those statements came in the course of an event the city attorney "attended in his capacity as city attorney," and the city attorney doubtless had "the authority, if not the duty," to publicly respond to what the mayor had said about him and his office earlier that same day. *Id.* at 26, 29. That is about as far as it gets from sending an email bought and paid for by an official's political campaign openly seeking financial support for his decidedly *un*official campaign activities.

3. Because Bonta misunderstands both Exxon's argument and the district court's decision, his policy arguments are misplaced. Bonta insists that he must be granted immunity for the statements made in his campaign email because otherwise government officials will operate in "fear of damage suits in respect of acts done in the course of those duties." Bonta.Br.13 (quoting *Barr v. Matteo*, 360 U.S. 564, 571 (1959) (plurality op.)); *see also* Bonta.Br.26, 38 (invoking *Barr* again). But no one is suggesting that elected officials lack immunity, whether under Texas or California law, for "press releases, press conferences and other public statements" informing their constituents of the activities of the office. *Rothman v. Jackson*, 57 Cal.Rptr.2d 284, 294 n.6 (Cal. Ct. App. 1996). Public officials cannot claim immunity for communications that serve the entirely different objective of securing campaign

contributions simply because those unofficial communications happen to talk about activities the candidate has engaged in while in office.

Importantly, this Court has been down this road before, and it declined to take the turn Bonta suggests it should. In *Williams v. Brooks*, a Congressman pressed the argument that the "*Barr* rationale—that if officials do not receive official immunity, they would hesitate to give public statements in their official capacities"—meant he should be immune from suit, too. 945 F.2d 1322, 1330 (5th Cir. 1991). Yet this Court rejected that license for politicians to lie and defame: "To hold that any statements conceivably within the 'informing function' of members of Congress are absolutely immune from suit for defamation would almost wholly exempt senators and representatives from state defamation laws." *Brooks*, 945 F.2d at 1331. This Court should reject such a sweeping approach once again.

Next, far from helping his cause, the statements Bonta invokes from the Texas and Florida Attorneys General just underscore the difference between speaking as an officeholder and speaking as an office-seeker. *See* Bonta.Br.27-28 nn.8-9. Each of those statements comes from a press release posted on the Attorney General's official website and features prominently the seal of the office. Neither is accompanied by a donation link, a sign-off from a campaign, or a disclosure that it was paid for by a registered campaign committee. *Compare* Off. of Att'y Gen. James Uthmeier, *Attorney General James Uthmeier Launches Investigation into Discord*

*over Child Safety Concerns* (Mar. 18, 2026), https://perma.cc/5HBG-THB4; Att'y Gen. of Tex., *Attorney General Ken Paxton Files Landmark Lawsuit Against Discord for Deceiving Parents and Exposing Texas Children to Predators* (May 22, 2026), https://perma.cc/2NJB-6QSZ; *with* ROA.72-75. Virtually the only thing those press releases have in common with Bonta's email is that they too discuss litigation. Comparing those press releases to Bonta's campaign email thus underscores the commonsense difference between sharing information about the actions of an office with constituents and leveraging those actions to secure campaign contributions from grassroots supporters nationwide.

Moreover, Bonta's attempt to collapse that distinction would skew elections by creating an extraordinary asymmetry between incumbents and their political opponents. As California's own law reflects, *see, e.g.*, Cal. Gov't Code §8314, public officials are not supposed to use their office to conduct campaigning activity, as the state itself does not take sides in who should hold office. Yet Bonta's rule would convert virtually all campaign activity into official business, creating a wildly uneven playing field in elections. After all, ordinary citizens hoping to displace an incumbent cannot purport to claim official immunity for their electioneering communications. They must instead conduct their campaigns against the background of prohibitions on defamation and other non-protected speech. The same must hold true for incumbents, lest elections be fundamentally distorted. *See,*

*e.g.*, *Blassingame*, 87 F.4th at 4. Incumbents already enjoy many advantages that make them notoriously difficult to dislodge. *See, e.g.*, Ben Reynolds, *Incumbency Performance in State Elections*, Council of State Gov'ts (Nov. 16, 2022), https://perma.cc/L8W8-TPNU (noting incumbents enjoy advantages in fundraising and name recognition and reporting that in state elections in 2022, "[a]mong incumbents, only 4% lost a competitive race"). They do not need a license to lie on top of all those other advantages.

Finally, Bonta's appeals to general notions of comity and federalism, and the policy favoring dismissal of suits against officials that should have been brought against states, are unavailing. *Contra* Bonta.Br.25-32. Bonta's own authorities agree that such policy considerations are implicated when a suit directed against a government official "should have been brought against the government" in order to effectuate policies that favor "protect[ing] governmental employees *acting in the scope of employment*." *Tex. Adjutant Gen.'s Off. v. Ngakoue*, 408 S.W.3d 350, 355, 357 (Tex. 2013) (emphasis added); *see also Colome v. State Athletic Com.*, 55 Cal.Rptr.2d 300, 307 (Cal. Ct. App. 1996) (noting California "state policy [is] to protect its public officials from decisions *made in the course and scope of their employment*") (emphasis added). Because Bonta's campaign email fell well outside the scope of his employment, those policies—and values of comity, federalism, and the like—are not frustrated by affirming the district court's decision here. *Contra*

Bonta.Br.28-32. Indeed, if anything would frustrate comity, it would be to license the Attorney General of California to reach into Texas and make defamatory statements about the Texas-based activities of a Texas-based business in the course of a campaign email solicitating contributions from Texans to support his campaign for office in California.

### D. Bonta's Defamatory Statements to Reuters Do Not Enjoy Official Immunity, Either.

Bonta's statements during a Reuters interview at "Climate Week" in New York City present a closer case, but only because the mailer from Bonta HQ, paid for by his campaign, and expressly soliciting donations, is an open-and-shut case of electioneering. But at this early stage in the proceedings, there is no basis for reversing the district court's denial of Bonta's motion to dismiss concerning the Reuters interview. Nor is there any need to delve into Bonta's extensive discussion of choice-of-law principles, Texas and California policy, and various attacks on the district court's reasoning, as this Court can affirm without reaching any of those arguments. But they are in all events unavailing, as the district court both correctly chose and correctly applied Texas law.

1. As an initial matter, this Court need not resolve any choice-of-law questions if it affirms the district court's decision on the ground that Bonta's interview statements also fell outside the scope of Bonta's employment. *See* ROA.1265-67 (ExxonMobil arguing as much below); *Yellen*, 105 F.4th at 763 (explaining that this

Court "may affirm for any reason supported by the record, even if not relied on by the district court"). And the complaint adequately alleges that they were.

Bonta's comments were offered at Climate Week NYC, a "global climate event" featuring "leaders from the world of business, tech, politics, academia, and civil society." ROA.1381. Viewed in "context," Bonta's interview in New York was not "clothed in [any] trappings of an official function" of the State of California "based on objective indicia." *Blassingame*, 87 F.4th at 21. Going to the other side of the country for a "global" climate event is (at the very least) a curious way to keep Californians informed of the business of the state, but it is an obvious way to generate attention in a fundraising-rich environment 3,000 miles away. It is, for instance, quite different than hosting an official press conference with members of a statewide commission, *see Kilgore*, 640 P.2d at 795-98, with all "trappings" of an official state-sanctioned event, *Blassingame*, 87 F.4th at 21. Climate Week NYC did not take place at the California—or even New York—Department of Justice.

The interview's unsubtle political and partisan overtones—including discussions of the "very tight" presidential election and Bonta's hopes as to who might prevail in it—reinforce the distinction between a campaign interview with a national media outlet and the official work of the Attorney General of California. *See* ROA.66. So does Bonta's subsequent promotion of the interview on his personal social-media accounts. ROA.47. In short, there is plenty of reason to conclude that

when Bonta urged the audience before him at Climate Week NYC to "look at Houston" as an example of the "false promise" of advanced recycling, and condemned ExxonMobil as "one of the biggest liars," ROA.50, ROA.65-66, he was speaking in his personal capacity as a politician campaigning for office, not in his official capacity as the California Attorney General.

All of that provides a sufficient basis to affirm the district court's judgment. Especially in the context of a motion to dismiss, where all facts must be viewed in the light most favorable to the plaintiff, *Lane*, 529 F.3d at 557, ExxonMobil has plausibly alleged that Bonta gave this interview not as California's Attorney General, but as one in pursuit of that (or another) office. And speech as a candidate is not within the scope of Bonta's duties as Attorney General. *See supra* Part.I.B.

2. That said, the district court's choice of Texas law was correct. As the court explained, both California and Texas extend official immunity only to acts taken in one's official capacity. *See supra* Part.I.A. Indeed, Bonta himself argued below that the district court did not need to "conduct the choice-of-law analysis" because Texas and California law are materially similar. ROA.285 n.8. Bonta now changes his tune, arguing that they cannot be the same insofar as Texas extends *statutory* immunity only to Texas officials. Bonta.Br.21-25. But the district correctly concluded that this does not matter because Texas *common* law is the same as California law, too. ROA.1874-77. The Texas Tort Claims Act (the "TTCA") just

"alters the common-law scheme by requiring plaintiffs to choose between suing the governmental unit under the Act and suing a responsible employee in an individual capacity." ROA.1874 (quoting *Garza v. Harrison*, 574 S.W.3d 389, 399 (Tex. 2019) (citing Tex. Civ. Prac. & Rem. Code Ann. §101.106(a)-(f)). So while Bonta cannot invoke the TTCA itself (as it is not for Texas to decide when parties may sue the State of California), Texas common-law affords him the same immunity as the TTCA.

Indeed, Bonta still has not explained how the immunity available under California law is any different from the immunity available under Texas common law—which is a problem for Bonta since the party asserting such a conflict bears the burden of showing that the other state's law differs from Texas law. *See Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 53 (Tex. 2008); *Playboy Enters.*, 519 F.App'x at 225. Bonta has not carried that burden (nor has he tried to do so). Instead, he insists that Texas must not afford the same immunity because the district court concluded that he is not entitled to immunity under Texas law. *See* Bonta.Br.19-25.[7] But that begs the question

[7] Bonta also briefly argues that the TTCA must cover him despite its plain text saying it applies to employees of "this state." Bonta.Br.24. But Texas's Supreme Court is "a text-centric Court," and a "cardinal rule of a text-centric court is that it must not judicially amend a statute to add words that are not there." *See Ford Motor Co. v. Parks*, 691 S.W.3d 475, 482 n.36 (Tex. 2024) (quotation marks omitted). Bonta's proposed approach would contravene that cardinal rule.

whether his statements would have been entitled to immunity under California law either. And Bonta's dogged insistence that the answer is yes relies almost exclusively on his view that he was acting in the scope of his official duties, which, at least as to the email, the district court (correctly) concluded he was not. *See* ROA.1880; *supra* Part I.A-C.

To be sure, the district court reached a different conclusion as to the statements in the Reuters interview, which it viewed as official, but not covered under Texas's good-faith rule. ROA.1879-80. But Bonta does not argue that California law lacks a comparable rule. As such, he has forfeited any such argument. *See SEC v. Hallam*, 42 F.4th 316, 327 (5th Cir. 2022) ("Any issue not raised in an appellant's opening brief is forfeited.") (brackets omitted). Nor, it seems, could he make that argument, as California decidedly does not immunize *every* act taken in the course of one's official duties. For instance, the statutory provision he invokes provides immunity only for statements made "in the *proper* discharge of an official duty." Cal. Civ. Code §47(a) (emphasis added); *see* Bonta.Br.13. And California law does not provide immunity for acts taken in one's official capacity that are "clearly inconsistent, incompatible, in conflict with, or inimical to his or her duties as a state officer or employee." Cal. Gov't Code §19990. California law thus incorporates principles akin to the "good-faith" concept in Texas law, which supports the district court's conclusion that the two states' laws "do not differ in substance." ROA.1877.

In all events, if Bonta believes that the two states' laws differ in this respect, he had the burden to show as much. *See Excess Underwriters*, 246 S.W.3d at 53. But far from having made that showing, he has not offered any argument even now that California law differs from Texas law on this point.

3. Bonta also takes issue with the district court's application of the good-faith rule, arguing that the court failed to respect "the subjective/objective distinction" that Texas law draws. Bonta.Br.37. In fact, the district court faithfully articulated and applied that distinction in concluding that the Reuters statements cannot be dismissed on immunity grounds. As the Supreme Court of Texas has explained, the good-faith test's "focus is on the objective facts and information the officer knew and perceived." *Sauls*, 690 S.W.3d at 74-75. To determine whether official actions were taken in good faith, courts must look at what "a reasonably prudent officer, *possessed of the same information* and under the same or similar circumstances, could have believed." *Id.* at 75 (emphasis added). Courts thus cannot undertake that objective analysis without determining what information the officer in question possessed (or, in the motion-to-dismiss context, was alleged to possess).

That is precisely what the district court did. As it explained, the good-faith inquiry focuses on "the objective facts and information the officer knew and perceived." ROA.1880 (quoting *Sauls*, 690 S.W.3d at 74-75). And ExxonMobil's complaint alleges that Bonta "knew his defamatory statements were false and that

he made them as part of a concerted attack on ExxonMobil." ROA.1879; *see* ROA.49-50. Because the complaint plausibly alleges that Bonta possessed information that would make a reasonable person aware that the charges he leveled at ExxonMobil in the Reuters interview were false, the court correctly concluded that Bonta failed to demonstrate that ExxonMobil could not "prove any set of facts … that would entitle [it] to relief." ROA.1879-80 (quoting *Robledo*, 147 F.4th at 519); *see Gilbert v. Donahoe*, 751 F.3d 303, 307 (5th Cir. 2014) ("[A] motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."); *Robledo*, 147 F.4th at 519 (similar). That reasoning does not require embracing any sort of subjective inquiry. *Contra* Bonta.Br.37. It instead reflects a faithful application of the principles set out in *Sauls*.

Bonta's contrary arguments ignore what he actually said. Bonta insists that he must not have known that his statements were false because the complaint itself shows that reasonable minds can disagree about whether "advanced recycling … work[s] to the extent ExxonMobil claims." Bonta.Br.35. But Bonta did not express "disagreement" with ExxonMobil about the effectiveness of advanced recycling. Bonta.Br.36. He labeled advanced recycling "a false promise" that is "not based on truth" and branded ExxonMobil "one of the biggest liars" for "promoting [the]

myth" that it even qualifies as a form of "recycling." ROA.64-66. Bonta's felt need to whitewash his own statements underscores that even he appreciates the difference between engaging in the kind of "debate [on] issues of public importance" that is more a matter of opinion than fact, Bonta.Br.36, and accusing someone of perpetrating a massive fraud on the public. And while the former may be the type thing that one cannot actually know to be false, the latter most definitely is.

## II. The Eleventh Amendment Does Not Bar This Suit.

The Eleventh Amendment does not shield Bonta from suit for his defamatory comments for reasons that largely track the reasons Bonta lacks official immunity. "California is not the target of this lawsuit," as it "concerns an *individual's* behavior" and seeks relief only against that individual in his individual capacity. ROA.1882. The district court thus correctly concluded that the Eleventh Amendment does not bar this suit.

### A. The Eleventh Amendment Generally Does Not Protect Officers Sued in Their Individual Capacities.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State[.]" U.S. Const. amend. XI. Where it applies, "Eleventh Amendment immunity operates like a jurisdictional bar, depriving federal courts of the power to adjudicate suits against

a state." *Union Pac. R. Co. v. La. Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011) (per curiam).

As this Court has long recognized, "[a]s a general rule the Eleventh Amendment does not bar suits against officers in their individual capacities." *Modica*, 465 F.3d at 183. Of course, if a lawsuit is really against the state in all but name, courts can recognize as much, *see, e.g.*, *Stramaski*, 44 F.4th at 324, because "sovereign immunity also prohibits suits against state officials or agencies that are effectively suits against a state," *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). What matters, then, is "[w]hether the state is the real party in interest," which turns "on the circumstances of the case," and in particular on the relief sought. *Stramaski*, 44 F4th at 322.

For instance, "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). That makes sense, as that "[t]he purpose of the Eleventh Amendment is to recognize state sovereignty by shielding states, absent their consent or an explicit act of Congress, from money judgments assessed in federal court." *Stratta v. Roe*, 961 F.3d 340, 350 (5th Cir. 2020); *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) (describing "the prevention of federal-court judgments that must be paid out

of a State's treasury" as "the impetus for the Eleventh Amendment"). The Eleventh Amendment also kicks in when the suit is against an individual but "the decree would operate against the" state itself. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). Again, that exception ensures that plaintiffs cannot get around the Eleventh Amendment by declining to name the state or any of its offices as a defendant.

*Henley v. Simpson*, 527 F.App'x 303 (5th Cir. 2013) (per curiam), is illustrative. There, this Court confronted claims brought by former Mississippi Highway Patrol K-9 officers who sought overtime wages that they claimed they were due because they worked more than 40 hours a week training and caring for their service canines. *Id.* at 303-04. Though the officers sued former state officials only in their individual capacities, the officials argued that Mississippi was the real party in interest. *Id.* at 305. This Court agreed, concluding that, when "plaintiffs name state officials individually for the payment of wages, the State is the real party in interest." *Id.* at 307. Such a suit is, after all, "in essence one for the recovery of money from the state." *Id.* at 306; *see also Pennhurst*, 465 U.S. at 101 n.11 (explaining that as a general matter, "a suit is against the sovereign if the judgment sought would expend itself on the public treasury"). By contrast, when confronted with a suit that challenged no state "policy or other state-initiated action," or exercise

of any official state duties, this Court concluded that the defendant—not the state—was in fact "the true party in interest." *Stramaski*, 44 F.4th at 326.

**B. Sovereign Immunity Does Not Apply to This Suit Against Bonta in His Individual Capacity.**

ExxonMobil's complaint makes clear beyond cavil that this is a case against Bonta as an individual, not against California. That reality defeats Bonta claim to Eleventh Amendment immunity, just as it defeats his claim to official immunity. Giving state officials a license to lie and defame in electioneering communications has nothing to recommend it whether the asserted license stems from the Eleventh Amendment or official-immunity principles.

"As a general rule the Eleventh Amendment does not bar suits against officers in their individual capacities." *Modica*, 465 F.3d at 183. ExxonMobil brought this case against Bonta "in his individual capacity." ROA.23 (capitalization altered); *see* ROA.167 (civil cover sheet). And ExxonMobil seeks relief against Bonta only in that capacity—a fact that he recognizes. *See* Bonta.Br.6 (framing ExxonMobil's suit as an effort to hold Bonta "liable personally"). And, as this Court has noted, "if the individual state employees will be personally liable for the judgment—even if indemnified by the state—then the Eleventh Amendment is inapplicable." *Stramaski*, 44 F.4th at 324. Indeed, given the nature of the allegations, if any entity other than Bonta were to pay the judgment here, it would be his campaign. Critically, too, ExxonMobil does not seek any payment from the state or request any relief

aimed "at changing the way California operates, compelling California to act, or accomplishing a California policy change." ROA.1882. ExxonMobil instead seeks an order enjoining Bonta to "cease interfering with existing and prospective business relationships" through defamatory statements. ROA.61. If ExxonMobil were to win that relief, Bonta would need to refrain from defaming ExxonMobil in his campaign emails or in interviews at, say, Climate Week 2028. But he would be free in his capacity as Attorney General to continue to litigate the state's claims against ExxonMobil. And if his campaign to be reelected Attorney General is unsuccessful, any judgment against Bonta would have no compulsory impact on the next occupant of that office. All of that underscores that ExxonMobil sued Bonta in his personal capacity because this really is a suit against Bonta, not an attempted "'end run' around the Eleventh Amendment." *Henley*, 527 F.App'x at 307.

### C. Bonta's Contrary Arguments Are Legally and Factually Flawed.

Bonta's contrary arguments are unpersuasive. He insists that ExxonMobil's suit "has the same effect as a suit against the State directly." Bonta.Br.48-49. But the very case he invokes in support of that argument refutes it. In *Luder v. Endicott*, 253 F.3d 1020 (7th Cir. 2001), employees of a Wisconsin state prison brought claims under the Fair Labor Standards Act ("FLSA") seeking damages against the warden and other prison officials. *Id.* at 1021-22. Though the suit was styled as an individual-capacity suit, the court concluded that it would "really and substantially

be against the state," because the plaintiffs were "seeking to force the state to accede to their view of the [FLSA] and to pay them accordingly." *Id.* at 1023-24. The court emphasized the "inescapable" conclusion, moreover, that "money will flow from the state treasury to the plaintiffs," as the "defendants are not going to pay a chunk of the prison's wages out of their own shallow pockets." *Id.* The suit was thus a classic "effort at an end run around the Eleventh Amendment." *Id.* at 1025. This case is nothing like *Luder*. ExxonMobil is not trying to impose any policy changes on California or claiming entitlement to money owed for work done for the state. It seeks relief only against Bonta himself, for actions that were neither required nor even taken under the auspices of his office. *See supra* Part I.

That likewise defeats Bonta's reliance on *Stramaski* to argue that he did not "act wrongfully" because he was merely acting to "enforce" California law. 44 F.4th at 322-326; *see* Bonta.Br.52. The language Bonta cites from *Stramaski* was describing a case in which the state officials who were sued in their individual capacity had not designed the "policy manual" with which the plaintiffs took issue, "but … were obligated to enforce it." 44 F.4th at 325 (discussing *Henley*, 527 F.App'x at 307). Because the defendants merely did what they were duty-bound to do under policies crafted by the state, the Court concluded that a suit against them "would evade the Eleventh Amendment for what was in fact a complaint about *what the state had done*." *Id.* (emphasis added). This case has nothing to do with any

official state policies. California prohibits its officials from using their offices to engage in "campaign activity," *see* Cal. Gov't Code §8314, and it certainly does not compel them to defame people in the course of doing so. And Bonta points to no policy that requires the Attorney General to travel across the country to Climate Week NYC and give defamatory interviews about parties the state has sued. To the contrary, he expressly argued below that his actions were *not* compelled by California law. *See* ROA.291-92 (arguing that Bonta's statements "fulfilled *discretionary* duties" because he "was not ordered or instructed to speak publicly about California's lawsuit" and did so based on "personal deliberation and judgment") (emphasis added). Indeed, if any entity were to indemnify Bonta for such electioneering excesses, it would seemingly be his campaign, not California.

Bonta's insistence (at 48-49) that ExxonMobil's suit attacks the state fisc fares no better. To be sure, the suit may impact the state's coffers if California chooses to indemnify Bonta. But the Supreme Court has squarely held that "an indemnification provision cannot, as a matter of law, extend sovereign immunity to individual employees who would otherwise not fall under its protective cloak." *Clarke*, 581 U.S. at 164-65. As the Court explained in reaching that conclusion, "States institute indemnification policies voluntarily." *Id.* at 167. And "the concern that originally drove the adoption of the Eleventh Amendment" was "the protection of the States against *involuntary* liability." *Id.* (emphasis added). As a result, "indemnification

provisions do not implicate one of the underlying rationales for state sovereign immunity—a government's ability to make its own decisions about 'the allocation of scarce resources.'" *Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 751 (1999)). States thus may not manufacture sovereign immunity for their officials by agreeing to foot the bill for their wrongful deeds.

Indeed, this Court recognized that principle long before *Clarke*, explaining that "the existence of an indemnification statute promising to pay judgments when an officer is sued in his individual capacity does not extend the Eleventh Amendment's protections around the officer." *Hudson v. City of New Orleans*, 174 F.3d 677, 687 n.7 (5th Cir. 1999). So did other courts. *See, e.g.*, *Luder*, 253 F.3d at 1023 (deeming "fact that the state chooses to indemnify its employees who are sued in federal court" to be "irrelevant"); *Wilson v. Beebe*, 770 F.2d 578, 588 (6th Cir. 1985) ("The State cannot create an Eleventh Amendment bar by its voluntary act[.]"); *Demery v. Kupperman*, 735 F.2d 1139, 1148 (9th Cir. 1984) (rejecting the idea that a state may "extend eleventh amendment immunity to its officials simply by enacting a statute by which it undertakes to indemnify officials for damage awards assessed against them"). California of course remains free to indemnify Bonta on whatever terms it chooses. But it cannot thereby deprive citizens of other states of their ability to hale Bonta into court to answer for actions undertaken in his individual capacity. Put simply, California's "indemnification provisions do not alter

the real-party-in-interest analysis for purposes of sovereign immunity." *Clarke*, 581 U.S. at 167.

At any rate, it is far from clear that California would immunize Bonta for these claims. Bonta noted below that California has generally agreed to indemnify employees for "actions taken within the scope of [their] employment," ROA.294-95 (citing Cal. Gov't Code §825(a)), and he argues on appeal that states would *have* to agree to indemnify people in Bonta's position to attract and retain elected officials, Bonta.Br.49. Much like his choice-of-law argument, however, that presupposes that all the statements at issue were actually made in the course of Bonta's official duties. And it is doubtful in the extreme that states would think that the only way to attract qualified elected officials is by promising to foot the bill if they defame people in their campaign communications should they run for reelection. In point of fact, the Ninth Circuit long ago rejected an effort by Washington's Attorney General to invoke official immunity to shield certain defamatory statements from suit, precisely because it concluded that "the means used to disseminate them and their financing could be shown to be purely electioneering in a private capacity." *Williams v. Gorton*, 529 F.2d 668, 672 (9th Cir. 1976). Washington has not lacked for competent Attorneys General since. Indeed, *Williams* has been the law in Bonta's home Circuit

for some fifty years, and it does not seem to have deterred anyone—let alone Bonta—from seeking public office or serving as a public official.[8]

Indeed, while Bonta insists that "this case will chill ongoing enforcement actions," Bonta.Br.51, it does not appear to have chilled Bonta's official speech or zealous representation of the state in the slightest, *see, e.g.*, Press Release, Rob Bonta, Off. of the Att'y Gen., *Attorney General Bonta Joins Coalition to Defend International Students' and Faculty's Free Speech Rights* (Aug. 13, 2026), https://perma.cc/8H8S-4W3A. Nor has it discouraged Bonta from seeking office, as he has stayed in the campaign for another term as Attorney General. *See, e.g.*, Rob Bonta for Att'y Gen., *Re-Elect Rob Bonta California Attorney General* (2026), https://perma.cc/7KQ9-YH3A. Moreover, "the day-to-day decisions of every local, State, and federal office" in exercising their official duties, Bonta.Br.52, do not typically entail deciding what to say in campaign communications or interviews at "Climate Week NYC." If those holding public office were to adjust their approach to anything in light of this case, it would seemingly be in refraining from engaging in defamation in their distinctly individual and non-sovereign campaigning activities.

---

[8] Notably, although state attorneys general are not shy about showing up as *amici* in cases that implicate matters of importance to the states, none submitted an amicus brief here.

* * *

"States cannot speak." Bonta.Br.1. *A fortiori*, States do not campaign. So it makes no sense to say that Bonta's defamatory speech was a part of his work as Attorney General, or to treat this suit against him as one that is truly against California. Official immunity is undoubtedly broad, but it is not unlimited. And all agree that neither Texas nor California extends official immunity to acts taken by elected officials acting outside the scope of their official duties. Nor does electioneering implicate California's sovereign immunity. Taking ExxonMobil's allegations as true, those simple principles suffice to resolve this interlocutory appeal. *See Robledo*, 147 F.4th at 519; *cf. Blassingame*, 87 F.4th at 31 (Katsas, J., concurring) (noting that the court held it "cannot resolve [the immunity question] on a motion to dismiss").

## CONCLUSION

For the reasons set forth above, this Court should affirm.


Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
*Counsel of Record*
ERIN E. MURPHY
CHADWICK J. HARPER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

KELLY BRECHTEL BECKER
MICHAEL P. CASH
KATHRYN ZAINEY GONSKI
LISKOW & LEWIS, A.P.L.C.
Suite 5000
701 Poydras Street
New Orleans, LA 70139

*Counsel for Plaintiff-Appellee Exxon Mobil Corporation*


September 3, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,577 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.

September 3, 2026

s/Paul D. Clement
Paul D. Clement